GRETCHEN GOSNEY, APPELLANT, V. DEPARTMENT OF PUBLIC WELFARE, STATE OF NEBRASKA, APPELLEE.

291 N. W. 2d 708

Filed April 29, 1980.  No. 42576.

William A. Tringe, Jr. and Riedmann & Kruger, for appellant.

Paul L. Douglas, Attorney General, Royce N. Harper, and Gary L. Baker, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

This is an appeal from an order of the District Court for Kearney County, Nebraska, which affirmed a decision of the State Department of Public Welfare (DPW) denying medical assistance to the plaintiff, Gretchen Gosney (Gretchen). This appeal involves the basic question of how to establish the residency of an incompetent adult.

On September 20, 1976, an application for medical assistance was filed on behalf of Gretchen with the

Kearney County Division of Public Welfare (Division). The application was denied on January 1, 1977, because it was determined that Gretchen was not a bona fide resident of Nebraska. This decision was appealed to the DPW under the provisions of Neb. Rev. Stat. §§ 68-1016 and 68-1024, (Reissue 1976), and a hearing was held on March 9, 1977. On March 25, 1977, DPW issued a finding and order, affirming the action of the Division. An appeal to the District Court, as provided by the provisions of Neb. Rev. Stat. § 84-917 (Reissue 1976), resulted in an order affirming the earlier order of the DPW. On appeal here, Gretchen assigns as error: (1) The finding by the District Court that the order of DPW was not in violation of constitutional provisions; (2) The finding by the District Court that the order of DPW was supported by competent, material, and substantial evidence in view of the entire record; and (3) The finding by the District Court that the order of the DPW was not arbitrary or capricious. We affirm.

The case was submitted to the District Court by stipulation of the parties on the record made before the DPW, and although we have been provided with no bill of exceptions, it is apparent that the record referred to is contained in the transcript and we will consider the case on that basis. At the outset, it must be said that because of the rather incomplete record made before the DPW, we are presented with a very sketchy factual background.

Gretchen is an adult female classified as having Down's Syndrome who has attained a mental age of between 4 and 5 years and possesses an I.Q. of 32 to 34. She was born March 7, 1957, and spent approximately 13 years in a special school in New York State. It is not clear whether her parents were also living in New York at that time, but in any event, they located in Denver, Colorado, in about 1966. Some time thereafter, Gretchen was removed from

New York State and brought to Denver where she resided with her parents. On June 23, 1975, she was brought to Bethphage Mission in Axtell, Kearney County, Nebraska, by her parents for in-patient care. Gretchen's parents paid the cost of maintaining her at Bethphage until some time shortly after she attained the age of majority under Nebraska law, which was on March 7, 1976. The parents continued to maintain their residence in Denver.

Neither of the parents testified at the hearing before the DPW. Gretchen also did not appear and, according to a representative of Bethphage Mission, her absence was due to the fact that "she wouldn't understand the importance of what is going on." The only other evidence presented established the residency of Gretchen's parents at Denver, Colorado, and disclosed that they had brought Gretchen to Bethphage Mission and that she remained a "guest" there at the time of trial. It is from this paucity of facts that we must conduct our review. Although Neb. Rev. Stat. § 84-918 (Reissue 1976) provides that any appeal from a judgment of the District Court under §§ 84-917 to 919 "shall be heard de novo on the record," we have interpreted that language to mean that we are limited to and "governed by the criteria of section 84-917 (6), R. R. S. 1943, as is the review by the District Court." *The 20's, Inc. v. Nebraska Liquor Control Commission,* 190 Neb. 761, 764, 212 N.W.2d 344, 346 (1973). Therefore, our review must be limited to whether or not the order of the DPW was in "violation of constitutional provisions," whether it was supported by "competent, material, and substantial evidence," and whether it was "[a]rbitrary or capricious." Neb. Rev. Stat. § 84-917 (6) (Reissue 1976).

In order to qualify for medical assistance under Nebraska law, a person "[m]ust be a bona fide resident of the State of Nebraska; . . . ." Neb. Rev. Stat § 68-1002 (Reissue 1976). See, also, § 68-1020 (Reissue

1976). The DPW found that Gretchen was "not a bona fide Nebraska resident because she came to the State of Nebraska for the sole and only purpose of receiving medical assistance; . . . ." Gretchen's constitutional attack, to which the greater portion of the argument portion of her brief is devoted, criticizes this finding as having created an irrebuttable presumption which excludes her from ever proving her eligibility for benefits. She contends that our decision in *Bauer v. Board of Regents of University of Nebraska,* 192 Neb. 87, 219 N.W.2d 236 (1974), prohibits such result. It is true that in that case we struck down that portion of a statute relating to resident and nonresident tuition which prohibited a person from ever establishing residence in Nebraska while attending any institution of learning within the state. We said, in *Bauer*: " '. . . (T)he Supreme Court clearly distinguished between statutory schemes that impose irrebutable [sic] presumptions of non-residence and those . . . that use residency requirements as one element in determining bona fide residence.' " *Id*. at 88, 219 N.W.2d 237 (quoting *Sturgis v. State of Washington* (D. Wash. Unrep. 1973), aff'd 414 U.S. 1057 (1973).) Also cited to us are the cases of *Carrington v. Rash,* 380 U.S. 89 (1965); *Shapiro v. Thompson,* 394 U.S. 618 (1969); and *Vlandis v. Kline,* 412 U.S. 441 (1973).

*Carrington v. Rash, supra,* involved a provision of the Texas Constitution which prohibited any member of the armed forces who moved his home to Texas from ever voting in any election in that state so long as such person remained a member of the armed forces. This was found to violate the equal protection clause, U.S. Const. amend. XIV. In *Shapiro v. Thompson, supra,* the court declared unconstitutional certain state and District of Columbia statutory provisions which denied welfare assistance to residents of the state or the District of Columbia who had not resided within the jurisdictions for at

least 1 year immediately preceding their applications. The precise holding of that case was that, absent a compelling state or governmental interest, such statutory provisions violated the equal protection clause by imposing a classification upon welfare applicants which impinged upon their constitutional right to travel freely from state to state. A requirement of a state statute that an applicant for medical assistance must be a bona fide resident of that state in order to receive such assistance and a finding that one is not a bona fide resident but one who comes into the state for the sole purpose of receiving such benefits, does not create any irrebuttable presumption or permanent classification that would prevent appropriate proof of legitimate residency. There is no constitutional denial of equal protection demonstrated by the facts of this case.

Illustrative of that position is the third case cited by Gretchen, *Vlandis v. Kline, supra*. There, a Connecticut statute which declared that students from outside of the state who came into the state to attend school were permanently and irrebuttably classified as nonresidents for tuition purposes, was held to be unconstitutional. Of particular interest to the question at hand is the following language from that case:

> We hold only that a permanent irrebuttable presumption of nonresidence . . . is violative of the Due Process Clause . . . . The State can establish such reasonable criteria for in-state status as to make virtually certain that students who are not, in fact, bona fide residents of the State, *but who have come there solely for educational purposes,* cannot take advantage of the in-state rates. Indeed . . . Connecticut, through an official opinion of its Attorney General, has adopted one such reasonable standard . . . :
> "In reviewing a claim of in-state status,

the issue becomes essentially one of domicile. In general, the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning. . . . Each individual case must be decided on its own particular facts. In reviewing a claim, relevant criteria include year-round residence, voter registration, place of filing tax returns, property ownership, driver's license, car registration, marital status, vacation employment, etc."

*Id.* at 453 (emphasis supplied).

In order to review Gretchen's second and third assignments of error, it is necessary to examine some general rules. "The terms 'residence' and 'domicile,' as used in statutes, are generally convertible terms . . . ." *Wood v. Roeder,* 45 Neb. 311, 315, 63 N.W. 853, 855 (1895). Domicile is that place where a person has his true, fixed, and permanent home. *Clymer v. LaVelle,* 194 Neb. 91, 230 N.W.2d 213 (1975). In order " 'to effect a change of domicile there must not only be a change of residence, but an intention to permanently abandon the former home. The mere residing at a different place, although evidence of a change, is, however long continued, *per se* insufficient.' " *State v. School District,* 55 Neb. 317, 320, 75 N.W. 855, 856 (1898) (quoting *Wood v. Roeder*). In order to acquire a domicile by choice there must be a concurrence of: "(1) Residence (bodily presence) in the new locality, and (2) an intention there to remain. . . . Act and intent must, therefore, concur, and the absence of either of these thwarts the change." *State v. Jones,* 202 Neb. 488, 492, 275 N.W.2d 851, 853 (1979).

It is therefore apparent that it is critical in the first instance at least that there be an intention manifested on Gretchen's behalf that she intended to make Nebraska her legal residence. She argues

that the decisions of the DPW and the District Court were arbitrary and capricious because the record upon which those decisions were made "contains no evidence whatsoever that Gretchen Gosney was unable to form at least a minimal desire or intention to remain in one location rather than another." The evidence disclosed that the reason Gretchen did not attend the administrative hearing was because "she wouldn't understand the importance of what is going on." Additionally, it was undisputed that she had an I.Q. of 32 to 34 and a mental age of between 4 and 5 years. It was not unreasonable for the DPW and the District Court to conclude on the basis of that record that Gretchen was totally incapable of manifesting an intelligent intent as to the establishment of a residence.

Perhaps of even greater significance is the fact that neither Gretchen nor anyone on her behalf came forward with any evidence from which any intent could be inferred. She had come to Nebraska from Colorado where she had made her home with her parents and her residence remained in Colorado at least through the period of her minority. The residence of a minor is, by operation of law, determined and fixed by that of the parent legally entitled to custody and control. *Clymer v. LaVelle, supra.* Upon reaching her majority, the presumption would be that her residence remained in Colorado.

> A person, who becomes mentally incapable of acquiring a domicil of choice before he comes of age and who continues to live with his parent, does not become emancipated upon arriving at majority. If no legal guardian of his person is appointed and if he continues to live with the parent, he has the domicil of the parent. If he does not continue to live with the parent, his domicil remains in the place in which he was domiciled at the time of his separation from the parent.

Restatement (Second) of Conflict of Laws § 23 at 95 (1969). If, because of her continued dependence upon her parents, Gretchen was considered to have continued to live with her parents, her residence was Colorado. If it could be said that she did not continue to live with them, her residence remained where it was at the time of separation, also Colorado. In order to qualify for assistance to the disabled, one must be a bona fide resident of Nebraska. Neb. Rev. Stat. § 68-1002 (Reissue 1976). Gretchen's residence having been established in Colorado, the burden was upon her to prove a change to Nebraska. " 'The burden of proof is on the party who asserts that a change of domicil has taken place.' " *Stucky v. Stucky,* 186 Neb. 636, 185 N.W.2d 656 (1971) (quoting Restatement (Second) of Conflict of Laws § 19, Comment c (Proposed Draft).)

In *Commonwealth v. Kernochan,* 129 Va. 405, 106 S.E. 367 (1921), a Miss Marshall had moved to New York State with her parents when she was between 8 and 10 years of age. Before reaching her majority, her mind became impaired while visiting an aunt who lived in Virginia. She was admitted to a mental hospital where she continued to reside up until the date of trial. The court said, at 411, 106 S.E. 369:

> Miss Marshall's domicile was clearly in New York at the time of her commitment to the hospital. There is no room for controversy upon this point. It has remained in New York to this day, notwithstanding her continued presence in Virginia, unless it has been changed by some competent and authorized person or tribunal, and the burden of proving the change is on the party alleging it.

Finally, Gretchen insists that the findings and orders of the DPW and of the District Court are not supported by competent, material, and relevant evidence, particularly in view of the apparent weight which was placed on the fact that she was moved to

Nebraska for the purpose of enjoying care at the Bethphage Mission. She argues that the motivation of a party in changing her legal residence is immaterial so long as she has the requisite intent to establish a new residence. *State ex rel. Rittenhouse v. Newman,* 189 Neb. 657, 204 N.W.2d 372 (1973). We have already touched on the issue of the absence of her expressed intent. Additionally, the mere transfer of a person to an institution on account of mental illness does not in and of itself alter the legal domicile. *Matter of First Trust Co. v. Goodrich,* 3 N.Y.2d 410, 144 N.E.2d 396, 165 N.Y.S.2d 510 (1957). Persons under legal disability generally are incapable of losing or gaining a residence or domicile by acts controlled by others. *County of Kearney v. County of Buffalo,* 167 Neb. 117, 91 N.W.2d 304 (1958). One exception to this rule is, of course, the situation earlier referred to where such person continues to reside with the parents. Additionally,

> [I]t appears that a court having jurisdiction over an incompetent, and particularly a court which has appointed a guardian for him, may, whenever it appears to be in the incompetent's best interest, direct or authorize the guardian or those having control of the incompetent's person to change the incompetent's domicil for him.

25 Am. Jur. 2d. *Domicile,* § 82 (1966). See, also, Annot. 96 A.L.R.2d 1236 (1964). Nevertheless, there is no evidence in this record that Gretchen had the requisite intent to change her domicile. There is nothing to indicate that her parents moved their residence to Nebraska so as to effect a change of domicile for her nor does the record reveal that any court authorized such change. As previously stated, bodily presence and intent, or authorized action, must concur for there to be a change in domicile and the absence of the same here thwarts any change. The order of the DPW was supported by competent,

material, and relevant evidence, as found by the District Court, and its judgment is affirmed.

AFFIRMED.

CLINTON, J., not voting.